So we now reach the matter of In Re Petition of Frescati Shipping Company, otherwise United States v. Sitco Asphalt Refining Company. And this being an admiralty case, I cannot resist, Mr. Phillips, you have the con. Your Honor, I appreciate that we have a little bit of humor during this process. I am here with what strikes me as an extraordinary case where $120 million has been imposed on my client in a situation where the duty that gives rise to that claim is one that's been satisfied by no owner of a wharf at any time prior to the accident in this case and no time since the accident in this case and where the district court substituted its judgment for the expert agency for exactly what is required in dealing with a single-hull vessel in order to prevent the very spill that took place in this situation. And on those bases, both the tort claim and the contract claims ought to be dismissed in their entirety. I thought that your tort argument was interesting that you started with that because as I read the panel's opinion, but this court's opinion written by Judge Ambrose, I thought he gave clear guidance that it was unnecessary for the district court to even go there based upon the district court's holding on the safe berth warranty. Do you agree or disagree with that? Well, I mean, if the district court had not decided the tort claim, that would have been one thing. But the court clearly in the previous proceeding remanded it back to the district court to entertain the question of what is the duty of care that ought to be applied. But why don't we start with the contract claim here in terms of your argument? Because if you don't prevail on that, we don't need to reach the tort claim. Well, I think you ought to decide the tort claim in any event because I think there's at least, depending on how you resolve it, at least some possibility of further review by another court. But at this stage, I'm happy to turn to the contract claim, recognizing that I don't believe that the duty of care the judge imposed has any basis on that. I just want to echo Chief Judge Smith. I share his concern. I think that, you know, I understand why the industry would like to see us, from your perspective, fix the error vis-a-vis negligence, but that doesn't help you prevail in this appeal. So I'm interested in hearing your arguments as to how you can prevail on the warranty. Right. And the specific holding of the panel below before was that if there is negligent seamanship, then that voids the warranty. So then the question is, was there negligent seamanship in this case? And negligent seamanship is determined candidly on the basis of strict compliance with federal regulations and with federal rules. That's what the Pennsylvania holds. They did it for statute. But the truth is, it's just as rigorous. It would apply just as well to a regulation. And the regulations in this case are absolutely clear. And we're dealing with a single-haul vessel, right? This is the vessel that is at most risk of having this kind of an accident take place. And so what do you want in that situation? The regulations, which are the addendum on 15 of the brief, 33 CFR 157.455, talk specifically about the need for written materials dealing with the under keel clearance. And specific notice being given in the master pilot exchanges. And if you compare that to the record in this case, it's absolutely clear that none of that took place. There was never any calculation of the under keel clearance in this instance. They all dealt with the issue as if they felt they had enough water. Let me understand your point. 157.455B contains a requirement to plan the voyage, I believe. Plan the ship's passage, right? Yes. Using, and then I think there's a term, factors to be considered that would be, or that were enumerated in the manual, the SACOs. Manual. And then it requires, and that requirement is to estimate the under keel clearance, as you've suggested. Help me to understand, is there effectively an incorporation of what is in a ship's manual into the regulatory requirement of what is to be considered for purposes of this plan? Absolutely. That's exactly what sub A refers to. Because if you're talking about this kind of a tanker, it says that it shall provide, the owner operator of the tank ship, shall provide the master with written under keel clearance guidance. And the under keel clearance guidance that was provided under these circumstances comes directly from the owner in its manual. And is that the 10% clearance that's described as normal? And we know from the pilot Bethel that if in fact there had been 110, if he had known that there was 110%, he would not have attempted to take this ship into the dock. So are you arguing that this is negligence per se? Is that your position? Well, no. Actually, at the end of the day, I don't need to do that. All I need to do is take advantage of the presumption that the Pennsylvania provides to us. It says that it's now their obligation to demonstrate by clear and convincing evidence that their breach of these regulations, which are designed specifically to avoid precisely this kind of an accident, could in no way have had any influence on it. And I candidly don't think there's any way, there's no way in this record that any court could make that kind of a finding. So it turns out to be per se, but only in practice. That factors to consider language that I referred to. Does that appear in 157.455B? Yes, Your Honor. That's 1234. Doesn't that strike you as inherently discretionary kind of language? Factors to consider. It is in the sense of how do you determine what the clearance is, but it's not discretionary as to the question of whether you make any determination of the clearance. I'm sorry, maybe I read it incorrectly. I assumed that factors to be considered was referring to the plan, not specifically to the keel clearance. Am I wrong in that regard? No, Your Honor. What it says is, shall provide the tank ship master with written under keel clearance guidance. That includes, and then it goes through factors that are supposed to be included in there. But at the end of the day, what you're supposed to have here is a very clear determination of how much clearance you're supposed to have. And what we get from everyone, the captain, the river pilot, the dock pilot, all said the same things. We were going by our expertise and experience in dealing with ship navigation. We never did an under keel clearance. Didn't even know it was a single hull vessel in the dock pilot's instance. And so we're in a situation where there is no way out of the finding that they violated the regulation. And the district court said, well, you know, it's good enough for government work, basically, because he said, you know, I find that there was an adequate discussion. But the whole point of this regulatory scheme, if you go back to the Federal Register when this was adopted, and what the Coast Guard said is that this is exactly the problem with not complying with these regulations. With compliance with that normal depth that was suggested for under keel clearance, the depth suggested in the manual, which I think was the 10 percent of the draft. Would that have prevented the elision that occurred here? There are two answers to that. One, presumptively it would have. Because if you violate the regulation, the presumption is that there is causation. But two, in this particular case, you don't have to worry about the presumption even. Because the dock pilot himself said if he had been told that they needed more clearance, he would have waited. Because the tide was coming in. He didn't have to go in at low tide. He could have waited until the tide came in. And if he had waited just an hour or so, the tide would have come in and he would have safely brought that tanker into the dock. And we wouldn't be here now, whatever, 13 years after the fact. And so it seems to me undeniable at this stage that the contract claim, that the warranty has been nullified under these circumstances. And the district court simply is wrong as a matter of law in saying that the regulations weren't violated. They clearly were. So if you take out the contract issue, you don't have to decide the tort issue, obviously. Are there any other questions? Well, on this issue of the regulations, you say that the regulation requires under keel clearance to be calculated from the controlling depth, not the average depth. How do we know that? I think all the parties agreed on that, actually. I thought that was the testimony. But I will check to make sure about that, Judge Hartman. But that was my understanding, that that was the testimony. But at the end of the day, it doesn't matter how much the depth is. I mean, it does matter if you want to do the flukes up, flukes down analysis. But you don't have to get to that. Because you can avoid that completely by saying there's been undeniably a violation of the regulations because they never once, they didn't satisfy the birth-to-birth voyage plan. They didn't satisfy the master-captain exchange. And they didn't satisfy the keel under clearance requirement. The birth-to-birth plan, we know it has to be in writing? Yes, it has to be in writing. Indeed, that's the specific, I mean, there is a specific document in the joint appendix that identifies the birth-to-birth plan that's supposed to be filled out. And, again, that's part of the manual which has been incorporated into here. So the three clear, unmistakable violations of the regulations, they are aimed specifically to prevent precisely what happened in this case. That is exactly what the Coast Guard said. It's people's use of judgment rather than sit down and calculate in order to avoid a problem. There is a curiosity, for me anyway, in what occurred here. And I will, I should say in the interest of full disclosure to everyone, there was a day that I did do a little bit of sailing. Most of it was on Chesapeake Bay. And I'm something of an expert on running aground. Or at least hitting, bouncing off of shoals. Do you specialize in collisions or collisions? I didn't specialize in anything, but you don't want to have to pay the Coast Guard very often to tell you off of those things. And is it, if the anchor here was fluked down, why didn't the Anthos 1 hit the shoal it had to pass first? Is it your position that the ship necessarily had a draft of more than 37 feet because the anchor was flunked down at the time of the accident? Now, how it got passed. If that's the case, how did it get across the shoal? I mean, I don't have an easy answer for that other than, you know. But the problem is that in trying to figure out whether or not you have enough clearance to get over something, it's not just based on the draft. It's based on your speed. It's based on, you know, like six or seven different factors that go into it, which can influence how high or low you are. The reason why there are multiple factors to take into account, Judge Smith, is because you want a thorough analysis of what's going on. And so maybe he was lucky to get over the shoal, but at the end of the day, if he had known, if he had followed the regulations, it would never have tried to enter at the end of this. And under those circumstances, this accident would not have taken place. That, as I said, is exactly why the Coast Guard adopted this very specific supplemental regulation that it adopted after it adopted all of the other post-valdez regulations. It adopted this one because it realized that these single-hull ships are at the greatest risk and certainly they don't exist any longer, and as a consequence. Why don't we move on then to the trick part of this case, which I know you want to address. If I'm right on the contract issue, then obviously you need to decide the tort issue, and the question is what's the duty of care? That's a question of law. The duty of care in this context, according to the district court, is that we should have engaged in the use of side sonar, and that has never been used. The testimony was undisputed. No warfinger has ever done that in the past. No warfinger has ever done that since. It's not required by the Coast Guard. The federal regulators themselves wouldn't engage in it, and we're talking about sonars that are being undertaken in federally controlled water. So you're just going to be drifting around essentially in a parking lot for boats or ships looking for something with no guidance, and what we know in this case is that when they actually knew where an accident took place, they still couldn't find it after the first 20 or so sonar scans. So the idea that we're going to impose this burden. This may be an inartful question or comment, but it strikes me that it is the duty imposed here is an extraordinarily specific duty compared to most tort-based duties that have developed in the common law tradition. I mean to have focused on this specific method to be used. Does it strike you that way at all? Well, I don't think so, in part because ultimately what you're saying is that you have to, I mean it's a little unusual I guess. A duty of care is very broad and understandable and traditional, but when a court, as opposed to say an administrative body, crafts a duty which suggests a specific means by which a duty of care can be met, that strikes me as being a bit unusual. It was also something of a curveball, a softball, but I obviously didn't state it very well. Well, look, I totally agree with you that this is an extraordinary. All right, enough of that question then. But I guess to that end then, you know, Mr. Phillips, what about when the side sonar radar five years, ten years, fifteen years from now is passé, that there is a more modern in the future means of detainment. We're left with this side sonar radar standard. Is that the right standard? Well, no, obviously.  If anybody is going to undertake to make law in this area, it ought to be the expert agency that understands the technology and understands its utility, and that expert agency doesn't impose upon itself any duties to use this kind of sonar today because it doesn't think it works officially. And hasn't the standard really been outlined and used and employed for the last 118 years? You know, under the Smith v. Burnett case and the cases that follow, hasn't that proved adequate up to this point? Sure, normally you look at what's a prudent, what would a prudent warfinger do under these circumstances? And it seems to me the best way to know that is to look at two sources. One, what's the regulatory world say about it? The regulatory world doesn't impose a duty. And two, what does every other warfinger do under these circumstances and every single one of them, both before and since, does not undertake to do this? And that should be the end of the argument as to whether there's a basis. You just don't do this sort of freewheeling cost-benefit analysis and say I'm going to impose this very specific duty on you and that it's going to be there for all time. Judge, Greg asked my question much better than I did. Well, I'm more aggressively and enthusiastically embraced it, I suppose, for my part. If there are no further questions, I have five minutes.  Thank you very much. Thank you, Your Honor. We'll hear from Mr. Levy for Frascati. Good morning, Your Honor. Ahoy. If you think a 45-year-old case is old, then maritime law will really give you some old cases with 1899 and Smith v. Burnett, Judge Brand. So let me address, if I could, the main issue that seemed to concern the Court with respect to the warranty claim. And that is, is there a violation? Well, I'm actually more concerned from your side on the tort claim because to put it as directly as I can, it seems unprecedented, the notion that this would be a duty under tort law. Help me with that. Sure. The issue of whether this was a duty for a warfinger to ascertain the conditions in the approach to its birth was already decided. It was decided by Smith v. Burnett in 1899. It was decided by this Court. The very issue that Mr. Phillips raises, is do we have a duty out there in the Federal Anchorage, was the issue that was before this Court in 2013. The Court said, yes, there is a duty. But the duty to make the approach safe, that I thought, perhaps assumed incorrectly, that that meant under normal conditions. I mean, this is the height of abnormality, right? I mean, who leaves an anchor? The duty is to ascertain the conditions and find out whether it's safe. All right, so in your view, every warfinger has a duty on a daily, perhaps an hourly basis, to have scans of not only the birth, but also the approach. No, that's not my view, and that's not what the District Court held. Help me describe what the duty is because the only way this accident or lesion could have been prevented, as I understand it, would have been if massive amounts of money were invested by the warfinger to constantly scan the rear bed. That's not what the District Court held. If you look at, I think it's footnote 109 of the District Court's opinion, the District Court was very, very concerned that this is a fact-specific circumstance. This was an oil terminal that was bringing in 50 to 60 ships a year. The District Court said you could use sonar, and the facts of record show that the people who knew exactly where the anchor was had great difficulty finding it. So it just strikes me as absurd to suggest that somebody who doesn't know an anchor is there has a duty to find it. The territory that would need to be scanned on a regular basis is remarkably larger than the area that was reviewed after the lesion, was it not? No, Your Honor, it was not. After the lesion, the area that was reviewed was the area that we thought was the approach to the berth and where we thought some obstruction might exist. The issue is not whether there is an anchor there. Of course, nobody could foresee that there would be an anchor standing seven foot off the bottom. The issue is, are there any obstructions in the approach to your berth that might endanger the ship that you are inviting in? That was the duty of Smith v. Burnett, the duty that was established again by this court, and it was the law of the case that was followed by the District Court in this instance. So the District Court then said, okay, what are the circumstances here? We have a terminal operator who is bringing in single-hull ships at a low stage of the tide so that they can avoid demerge costs. They are bringing in a product that if it spills is going to be a disaster, so the gravity of the harm is tremendous. The foreseeability of some object being down there is very foreseeable, and it's foreseeable that somebody might hit an object on the riverbed. That's foreseeable, certainly. So they had to ascertain what was out there. If they had done that, the court said, they would have found the anchor. Now they didn't find it. It appears on the side scans, some of our scans. Was it Mr. Fish who was your side scan expert? There were two. There was Mr. Capone and there was Mr. Fish. We used Mr. Fish to actually find the anchor. And it took him over a month, didn't it? It took him a month to identify. Doesn't that support the burdensome nature of this so-called duty that is being complained of by the other side? It certainly is not an easy thing. You're always going to find it. The side scan sonar detects the objects there that are on the bottom, and then they have to send divers down to look and see what they are. We found a pump case, and if you look at Exhibit B3, to the judge's opinion, a great big 15-foot pump casing that's pulled out of the water at our expense. My last question, doesn't that raise a question even of the efficacy of this specific duty that has been imposed by the district court? It's one thing to look for something when you know it's there. It's a very different exercise when you're searching to see if something is there. And when it takes you more than a month to find the location of something, you know it's there. A couple of things, and I've got a few seconds to respond, but a couple of things. Number one, if you're looking for this object, in this case, they would have found it on side scan sonar. That object, we know, the anchor, had been down there on the riverbed for three years at least. The stipulation is five to ten years. Three years at least because that's when Delaware University had picked it up. So we know side scan sonar is effective in picking it up. And so the court was saying periodic side scan sonar, if they had been doing this for three years, they would have found it. And that's a factual issue. The standard of care in this instance is a factual issue. This court said they have a duty. District court, tell us how to go about fulfilling that duty. The judge said you could walk the bottom. You could do wire drives, which they've done for centuries, to see what objects are down there. CITCO was doing nothing, not only out there in the anchorage, but it wasn't doing it in its own area. Well, let me ask you this. The district court did not merely impose a prospective duty. CITCO here is being held liable for breaching a duty that did not exist at the time of the elision. Does that make sense? It makes sense, but it's not correct, Your Honor. The duty existed since Smith v. Burnett in 1899. The duty in Smith v. Burnett was to ascertain the conditions and make them safe for the vessel arriving, either warn or remove any obstructions that might damage the ship, and it's fair. They're the ones planting themselves on the riverbed saying we want to make money, $250 million a year in revenue, and compare that and the modest cost, and even though it may be hard to find at times or it may be expensive at times, depending on how your riverbed looks, but compare that with the cost of the cleanup. The quote from Smith v. Burnett from old Chief Justice Melville Fuller, we don't say to him very often, but here it is today. So this is what Chief Justice Fuller says. Although a warfinger does not guarantee the safety of vessels coming to his wars, he is bound to exercise reasonable diligence and ascertain the condition of the berths thereat, and if there is any dangerous obstruction, to remove it or to give notice of its existence to vessels about to use the berths. At the same time, the master is bound to use ordinary care and cannot carelessly run into danger. That's what the standard is. Yes, and if you read, they also cite with approval in that case the Cagliopi decision, and that case is quoted by this court and then again quoted by the district court on what the law is, and the law is to ascertain the conditions not only in the berth, but in the approaches to the berth. So if we look at the Smith v. Burnett decision, you go a little bit farther in, you see opinion by the House of Lords from England. I got it. House of Lords' opinion. But again, how does the district court's decision here sort itself around with the Sonat Marine against Belcher Oil decision, which was a District of New Jersey decision affirmed the following year by this court? That says, Sonat Court acknowledges the well-established rule, quote, it is true that the duty of a terminal operator extends only to the berth and to the approach to the berth, not to adjacent areas, end quote. Right. That issue was dealt with by this court in the original Frascati 1 opinion. They dealt with that issue and said, remind me of the approach. The approach is where the ship makes its natural turn from the channel in. There was no question that the ship was in the approach in this case,  and with negligent navigation in the Sonat case, and that's why that case is distinguishable. But it does stand for the principle that Sonat is another example of this court saying you have a duty in the approach. If there's a duty, there has to be a standard of care. CITCO advocates to do nothing. They don't want to do anything to ascertain the conditions in the approach to their berth. That's the standard of care they want, and that cannot be right. Mr. Reed, would you address Mr. Phillips' arguments regarding what he claims are the three violations of the regulations? Sure. If we look at the regulation, 33 CFR 157.455 A and B, they have basically five requirements, and I'll go through the requirements and I'll show you where the evidence is to support the judge's finding. The first requirement is the owner shall provide the master with written under keel clearance guidance. That can be found in the record at Joint Appendix 1191 and also Joint Appendix 79. There you'll find navigation discussed, and again, when we look at navigation and we look at that section, Section 3 of that document, that's the chopper's policy, has a description of the procedure for passage planning, and that procedure starts with the word charts and is covered with the word chart. This is how ships sail. They plan out their voyage on the charts. Does that plan need to be in writing? The regulation does not require it to be in writing. It does not. But it does have to occur prior to getting underway, right? Yes, it does. You seem to argue that the onboard discussions meant that there was adequate planning, but even if the athletics crew did discuss the passage onboard, the regulation says prior to getting underway. Right, and it was planned. If you look at the testimony of Captain Marcuse, he says that he reviewed the passage plan on the chart. He made changes to it before he departed Puerto Miranda, and that passage plan went birth to birth. There's also the testimony of Captain Betts, who the district court found to be credible, and who also talked about the planning on the charts. This is how ships sail on charts, not on forms. The form merely memorializes the discussions that took place for the plan. At the very least, that's your position. That's correct. That's correct. Now there's two other points, or three other points, with respect to the statute. Prior to getting underway, the master shall plan the voyage. So we've talked about that, that he did plan the voyage. It is on the charts. That's D7, 8, and 9 of the record below. And he has to estimate the underkill clearance. And there was evidence that he did estimate the underkill clearance, not only in coming out of Puerto Miranda, but before he got to Philadelphia, or before he got up to this area, Paulsboro. You'll recall from both Frascati 1 and from the district court's opinion in this case, he wouldn't load the ship to 37 feet because he had concerns about the underkill clearance of the ship. Like 37 six inches? He was instructed to load it up to 37 feet. He was concerned about the underkill clearance coming out of Puerto Miranda, so he loaded it to 36 six. He thought that was safer. That is evidence of estimating underkill clearance. He's asked on cross-examination, and this is cited to by the court of the district court. He's asked on cross-examination, did you consider that 36 six when you were going to arrive for your timing of arriving up in Paulsboro? And he said, yes, I did, but I thought it would be deeper up there. So he had taken that into consideration, and this was asked at the first trial. All right. All right. But we haven't exceeded the time, but this has been helpful. Thank you very much, Mr. Levin. Thank you. And up next, Mr. Berger. I've mispronounced a few names today, and that sounds like an appropriate French pronunciation, but tell me how I'm wrong. You are absolutely right. Thank you. One of the few courts that's gotten it right on the first time. Even a blind hug in front of a court every now and then. And I do appreciate the opportunity to speak to our one issue on appeal which was so important to us, which was we felt a fundamental unfairness in the award of prejudgment interest. Yeah, I'm curious about that. I don't mean to tell counsel ever how to go about things, but please tell me why there has been error here. We've been directed to our own taxman case, and isn't it appropriate to use either the prime rate or the post-judgment rate? It can be, Your Honor. As we've talked about road analogies before, as Yogi Berra said, when you come to a fork in the road, take it. And a lot of the discretion that's left to trial courts is just that. I do appreciate that while the athos came up on a rising tide, I'm coming up against a flowing tide. But the simple fact is that it all requires the exercise of discretion. And discretion is not untethered. A court must exercise some judgment in doing that. The district courts are given wide latitude. Taxman actually stands for the fact that that general principle and, you know, sunshipping and others all speak to the same issue. But this court has also reversed trial courts when they have not exercised that discretion well. It's not a very health discussion, but the ARCO pipeline case, this court did find that a rate was too low and imposed something different. There have been several instances. I think this court's decision in 2016 in Leonard v. Stemtech, the Addy decision, again, different reasons, but the court found that the way the district court exercised its discretion was not appropriate. Here, the court made an error of law. It determined that a cost of borrowing approach is simply not available if there isn't actual proof of borrowing. And this court has never reached that issue. Other courts have. I think the judge sided with a Fifth Circuit decision in Pillsbury. It's not a circuit court decision, a district court decision. And even though it favorably sided other decisions like independent bulk transport where the courts have said, this district court, we don't want to impose on district courts the duty to conduct detailed rate settings, and the courts should defer to a cost of borrowing approach like the prime rate or like the federal statutory rate. The problem with the federal statutory rate is first the judge takes his discretion away by saying, I'm not even going to consider a cost of borrowing approach. Then he takes the federal statute, and this is a little unusual. Most of these cases, trial judges are not looking at a period of 11 years and $143 million loss at the outset. And so some level of focus needed to come into play once he decided to pick the statute because the unique thing about the federal statute is it's prospective looking. And in this case, the Treasury had set the rate so low as a matter of government policy that for the last seven years, it was below 1%. There's simply no way it could be considered fair that Cargo can hire $55 million or $143 million when we first suffered our loss at less than 1% interest. And so the result is while $16 million seems like a significant amount of money, at the prime rate, at any rate that would have reflected a commercial borrowing rate, even the federal prime rate that this court approved in tax man would have resulted in an award that was literally $20 million or more higher. So there's a significant punitive effect on the party that actually did all the right things, spent $143 million, $88 million above its OPA limit. It did everything OPA required of it. It did it well. We received commendations from the Coast Guard. You spent $143 million? We did. You didn't get any reimbursement? We did. We got $88 million in reimbursement from the federal government under OPA. So our final damage claim was the $55 million we were awarded. But we were out $55 million for 11 years. And, you know, it was hired capital. The district court in its decision does cite to the cases which refer to this as hired capital. And we just think the decision in Amico-Cadiz, which is so analogous, or even if you're my view on this is we ought to change the rate or change the date. If we change the rate, you know, you're looking at that fact that it was so unusual for interest rates to be held low as a matter of government policy to stimulate growth after the economic crisis in 2008, that when you're looking at an interest period that spans that, it becomes arbitrary for a court to simply, without looking at that, simply say, okay, well, we're going to give you whatever that was. It's less than 1 percent. It's less than half a percent at times. Nobody in the commercial arena can get money at that cost. It also assumed that Frescati would have had the money each year to reinvest at that low rate. So the effect of what the district court did, first eliminating and taking away the ability to use a cost of borrowing approach, and then not really looking at the effect, the economic impact of picking a rate that was so low for a seven-year period, ends up being harmful and punitive in effect in the way that it did. We think also the court should be given some guidance because we don't think district courts should require cost of borrowing, the burden on the district courts and on parties to then basically go in and engage in a rate proceeding. All the discovery that goes into doing that, all of the testimony, the expert testimony, everything that goes into doing that ends up putting more of a burden on courts. When we started this case, we simply asked for prime. CARCO then submitted an expert report that said it ought to be less than prime. Ironically, had the court picked CARCO's low ball rate, we would have made $5 million more in interest than we would have gotten on the judge's decision, one of those funny ironies. But I'd like to reserve a minute for rebuttal if I may. No, the appellee does not get rebuttal. I'm an appellant. This is an interest issue. All right. Yes, that's true. That's true. All right. We'll give it to you. Now, we make up rules sometimes, too. Well, I'm happy to address any other questions. We'll have you back. Thank you very much. That's it. Ms. Murphy. May it please the Court, I'm Anne Murphy for the United States, and I'd also like to reserve one minute if I might for rebuttal. Your Honor, the United States is entitled to the full amount of its contract damages here, and CARCO is not entitled to a limit of liability that would be available to it under OPA. On the United States contract damages, Your Honor, it's important to note that the United States has a segregated claim here. I'm sorry, can I just, before we get into the damages, let's talk about liability for a minute. Who controls Anchorage No. 9? Nobody controls it in the sense of having an obligation that would be analogous to the kind of control that you would have over a piece of property on land, and it was a really critical thing that the district court got wrong. So does that mean no one is in charge of Anchorage No. 9? That's pretty much right, Your Honor. Okay, so the Corps of Engineers and NOAA have nothing to say about what happens on Anchorage No. 9? They say that you have a right to anchor there if you're a vessel. They say you have a right for the government to find out what the depth is in the anchorage and to dredge, to try and maintain project depth to the extent that they have resources. And then with respect to depth, the government also charts and maps so that people know what the depth is in the anchorage. All right, so based on what you're saying, it sounds like you would agree then the Corps of Engineers would not object, or the United States government would not object, if every war hanger on the Delaware River spent a lot of time with sonar scans, divers, populating that channel with a tremendous amount of activity on a daily basis to make sure that there are no anchors or other obstructions on the riverbed. Is that the government's position? It is absolutely the government's position. To survey, you don't need any government permission at all, anywhere in the anchorage. And that's an unregulable environment. It's open season. People, the war hangers can spend as much time or devote as many resources to Anchorage No. 9 as they see fit. The United States has nothing to say about that. The idea that there's going to be some craziness out on the water is wrong. Well, if we affirm a negligence duty, I expect a lot of craziness, right? I don't think that's true at all. For one thing, it's simply a misrepresentation in the amicus brief that the terminal owners do not, in fact, survey their berths. And I'd just like to point you to some of the district courts finding in the record. Is the berth the same thing as the anchorage, though? All the approaches, some of them, Mr. DePasquale surveyed that some of them actually search into the channel. I'm just trying to get my terminology right because I handled a lot of different cases. I never handled a lot of different cases. Isn't there a distinction between berth and approach? Yes, there is. But it's very important for purposes of this case because there's a lot of silt then kicked up about, oh, we should only do our berth and not our approach. And in the first Prescotti decision, that was rejected because the wharfing here, Carco, had decided that it wanted to have a kind of permit from the Corps to do dredging in its area. But it decided what size that would be. It wasn't that the Corps said, well, you can look here, but you can't come and do it in our anchorage ground. And for purposes of the contract claim, footnote 12 says that a concession was made by Carco, that the approach covered the safe berth warranty. Right. So it's in the approach. But it's important to know that, in fact, the wharfing, I disagree with this view that everyone's going to be out there every day. The duty is always a duty of reasonable care under the circumstances. I mean, there was no evidence of custom, and the Court finds that twice, that there's no evidence that wharfing does do or do not go and search their approaches. That's at J127 and 128. There's evidence from one of the past presidents of the Maritime Advisory Commission. Because, don't forget, this is incredibly practical. People have to know who's dredging, who's surveying. They have a commission that meets, and Carco's on the committee, where everybody is told what's going on. They can ask the government what's going on. So let's say people did want to go and survey and see what was on the bottom of their berths, which seems like a completely reasonable thing to do. If you're going to invite ships to your berths, you might as well do more than nothing, which is what was going on in that case. Ms. Murphy, since you have reserved a minute for rebuttal, I want to give you an opportunity, though even will exceed your time, to address recoupment. Yes. So I think this was guessing to that, though, which is that it is blatantly obvious from this record and the district court found that the government does not have a duty to search and find hidden objects. There's no regulation that imposes that duty. It makes much in its brief, as I recall, not only of the lack of a legal duty imposed, but of the limited resources available to the government to do just that. And my understanding is that what's actually going on out there is that most of the activity that is relevant to this involves dredging. Is that right? That's correct. Making sure that the main channel, first of all, is unimpeded, and perhaps other areas as well, certain anchorages, if there are resources to do that. That's right. It's for depth. It's all about depth and charting. And, of course, if you're dredging, you may find something on the bottom. But there's no obligation. And as you always point out, if, as the district court seemed to think, there was this obligation, the court and the government would be responsible for looking for hidden objects throughout the entire, not just the channels and the anchorage grounds, but everywhere. If you're right about that, and it seems fair, how can it be the case that Carco has the duty that you don't have? Why does anyone have the duty? Why isn't this just, I hate to oversimplify it, but why isn't this just an accident that no one could have foreseen? I mean, there's only one bad guy, namely the person or people that left the anchor on the riverbed. And why doesn't the pool that everyone pays into for these sorts of accidents cover the cost of recovery? All right, two points. First of all, Carco is not like an innocent bystander. Carco has a commercial warfare which invites vessels to so that it can do business. And if this court held in the first 31 decision that since 1899, there's been a duty for the person who's inviting the vessel to make sure that it's safe. In this case, and for our purposes, Carco also extended a contractual warranty saying, if you send your ship to this berth, she's going to be safe and always afloat. So it does have a legal duty, which we don't. I appreciate that distinction. I think that's an important one because if the warranty says that you're going to have a safe berth, and footnote 12, they conceded that the approach is part and parcel of the safe berth warranty, then they've got a problem under contract. I still, speaking only for myself, I still don't see how that gets any kind of a tort duty. For the berth, I understand. Tell me why I'm oversimplifying. I'm misunderstanding that the party that has the duty controls the area. So that to me means that if it's your berth, you need to keep your berth free of obstruction under negligence theory. But if you don't control the channel or you don't control the approach, then you don't have a duty under negligence law. You may have a contract duty, but you don't have a negligence duty. But I think that's misunderstanding the distinction between the river and the normal analogy that we all have in our head, which is like your driveway at home. I own my driveway. Exactly. These folks, Carco does it. You are disavowing from the government standpoint the duty of ownership, to use the analogy of the driveway, of the anchorage. And I'm agreeing with you on that. But what I'm disagreeing with you on that is how can you then lay off that duty to Carco? Because nor does it own or control the anchorage. But this court held that it has a duty to provide a safe approach. And the approach goes to the anchorage, which the bottom's owned by the state of New Jersey. There's something, a federal law that allows you to anchor there. But nobody controls it in the sense that you exclude people or a vessel can't come in. So Carco has every... To Judge Hardiman's point, so is the anchorage analogous then to a public thoroughfare? More analogous than to a parking lot. So let's say you live in like a posh suburb of Pittsburgh. And you are approaching your driveway that you own. You own the driveway. And an accident occurs in the driveway. Well, that may be on the landowner. But if the accident occurs in the public thoroughfare, it's not on the landowner, is it? No, but so what the court said in... It's not a perfect... Right. This is not a perfect analogy, but see where I'm going with that? Right, so this court said in Frescati 1, once you turn off the driveway and start going towards the dock, then Carco's responsible because it's invited the ships to traverse that... But you're still in the public thoroughfare, in my analogy. You're turning into your... Right, but you still have the duty based on Frescati 1, which is completely right. He said you couldn't even turn the ATHOS in the little area that Carco had designated as its berth. Because don't forget, it's not as though we're in a driveway. We can see where the boundaries are. Carco says, here's the area that we're going to assume responsibility for. We're fine, but the actual vessels, if you read in Frescati 1, the actual vessels have to come out of the channel across the anchorage ground, and they can't possibly do it across this little tiny area. And so what the court said was, you know, you still owe them a safe approach even here, and so your duty extends to that. And I'll part with respect to the federal parties. No entity or part of the federal government maintains or controls or directs anything in that anchorage that would stop Carco from doing anything it wants to scan or, you know, dredge or whatever it wants to do, it can do. And we also really want to make the point that Carco has this very limited duty in a limited area to let the vessels get there. But under district court's ruling, the federal agencies would have the same responsibility to look in every inch of federal water, like hundreds of miles of Delaware River. And that's only part of it. Thank you, Ms. Murphy. We will have you back, as we will Mr. Berger, for one-minute rebuttal. We'll hear now from Mr. Phillips in rebuttal. Thank you, Your Honor. I realize I'm the only thing standing between you and lunch at this point, other than two minutes, so I'm going to try to be brief. First of all, the notion that the decision when to bring this ship into the dock was made by the owner of the dock as opposed to the captain and the masters is ridiculous. They clearly made the decision, and they said specifically that if they had known of the requirement of the owner of the ship to have 110% of the clearance, they would have, in fact, waited. And there's no question about that. So that's not. And second, the question of what duty. We recognize we have a duty. We have a duty if there is a known hazard. Of course. We have to identify it. We may even have to remove it. Well, that's the negligence issue. But what about the contract issue? You do have a problem with footnote 12, right? I do in the sense that the scope of our obligation, but we still have, again, that warranty is completely nullified if the other side is engaged in poor seamanship. And candidly, you can go through all the evidence you want in this case, but at the end of the day you emphasize poor seamanship here at argument, but did you not also in the briefing address the seaworthiness of the vehicle? Well, we addressed – well, we made more of that in the district court. We did talk about flukes up, flukes down. Maybe I'm remembering from reading the district court. Our basic two arguments with respect to the inadequate seamanship was flukes up, flukes down, whether there was a sufficient draft under the circumstances. I think the clock was wrong. Yeah, he reserved five. Put four on, please. Go ahead. The one thing – he suggests that you're disposed to do a chart. I submit to you that in Joint Appendix 1180 says as plain as day, you're supposed to do a voyage plan. That's what the requirement of the manual is. It's written. It's supposed to be filled out. You're supposed to have it written under keel clearance. And, candidly, if they had done that and conveyed that information along the line, this accident never would have happened. You know that as a factual matter, but the truth is that Pennsylvania takes you there in any event. On prejudgment interests, unless you have questions, I'm going to rest on the briefs. And then with respect, again, I don't think you need to get to the equitable recruitment case because I don't think there's a basis for any liability, but, Judge Hardiman, I can only echo what you said, which is this is a fund, and you ought to fairly figure out the right way to allocate the fund. It doesn't really fit recruitment, though. It's an outlier. It is. But, again, it's very uncommon when you have a situation where you're talking about a fund that is candidly created in large measure by my own client and others similarly situated that the government is simply stewarding, and then the question is how much of that money ought to come and go. And under those circumstances, it seems to me, on the statutory scheme, tell us a little more about the fund. Is this case right in the heartland of what that fund is? It was a project on Valdez, right? Right. And it's basically a tax or tariff on every single gallon that we ship? On every single gallon that we ship, exactly. And, Sam, we pay it in. And religiously we spend well over $100 million. Tortuous activity, damages that accrue after tortuous activity? Yeah, I think it covers any kind of incident. It's designed to be the upfront money to take care of the cleanup. I mean, the key here is to get that cleaned up in the first instance and then sort of sort out kind of who's responsible for it. But, you know, Judge Hardiman, you're absolutely right. The only bad guy in this entire proceeding, notwithstanding a couple of shots at my client, the only bad guy is the person who left the anchor behind. And the truth is, in allocating as among everybody else, it seems to me my client shouldn't get that $140 million. If we were sitting here as three chancellors in equity, you know, maybe. . . I already have one. The district judge did that. It wasn't exactly the chancellor's foot, though, from your position, I guess. From my position, it wasn't anywhere near the chancellor's foot. But we're not. So we've got to wrestle with this issue of even if it's inequitable. . . I mean, your client promised that the Athos 1 would arrive safely. That was the charter party. That's the whole purpose of the document, right? Right. And it preached that promise. And you've got footnote 12 where your predecessor counsel conceded that the approach equals the birth for purposes of the safe birth warranty. So really the only . . . you've got to draw an inside straight here. You've got to show us that the district court made an error in law in not unburdening your client of that warranty because of the regulatory violations. Well, yeah, I mean, I don't know that that's an inside straight because it seems to me that it's candidly unequivocal at this point that there were clear violations of at least three elements of the regulatory scheme and under the Pennsylvania . . . But to Chief Justice's prior question, even assuming arguendo there is one or more violations, how do we know for sure that that vitiates the warranty? Well, on the underkill clearance, there are two reasons why you know that. One is, I mean, anytime you have a violation, it's presumptively the cause of the accident. So that gets back to the Pennsylvania issue. It gets back to the Pennsylvania. And once you've got that, then we've got causation. So if you agree with me on that, then we get a remand and there's some . . . No. . . . some poor district judge gets down a third trial. No, absolutely not. If you conclude, as you should, that they're engaged in negligent seamanship, that voids the warranty and that part of the case is gone. And then you do the tort, and there's no tort duty, and that part of the case is done. The quickest way to finish this is simply to reverse on the tort and contract claims. Thank you very much, Mr. Phillips. Mr. Berger, one minute only. Thank you, Your Honor. I appreciate the time. There's actually one point that I forgot to make, which is an important distinction. In some of the EEOC, the taxpaying case and others, they deal with a hypothetical employment arrangement. In the patent cases, they deal with a hypothetical royalty. So in those cases, it's appropriate to use an interest rate like the federal statutory rate, which is prospective looking. But in the case of the Athos, where we were actually out of pocket $143 million, that's a forced loan. And so some consideration should be given to that loss and the fact that this was hired capital and that the peculiar circumstances of the economic situation over the last seven years led to a particular hardship in the application of that rate over a longer period of time. And that's where we think the judge misused his discretion. Thank you very much. Thank you. Ms. Murphy. Thank you. I'd just like to talk a little bit about the fund, Your Honor, because it's not a piggy bank and it's not an insurance fund. It's like the fund is established by statute. It has certain things that it pays. If you want to look at the statutes, it's at 33 U.S.C. 1321 and 2712, and they do not include paying contract damages by oil companies. It's actually one of the key parts of this case is that the fund has lost money that it paid out, which was correct under the statute, for oil cleanup, which really should be put back into the fund. As Your Honors are well aware, oil cleanup is ferociously expensive, and it's very important that there be money in the fund for cleanup. But if there were no breach of contract or tort violation, the fund would pick up the cost of this incident, would it not? Right. So in a circumstance where, for example, nobody ever knows why the oil spilled or whatever, the fund will pick it up, and that benefits the whole industry. It's not as though CARCA is losing out here. It's they paid money and it doesn't get back. Thank you, Your Honors. Thank you very much. We thank all of counsel for their considerable help for the excellent briefing in this case, for introducing all of us to some issues we've not confronted before, and we will take the matter under advisement. Thank you very much. Thank you very much.